**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARIO HENDERSON,

          Petitioner,                 CASE NO. 06-CV-11083

-vs-                              PAUL D. BORMAN
                                   UNITED STATES DISTRICT JUDGE

KURT JONES,

          Respondent.
_____/

**OPINION AND ORDER**
**(1) DENYING HABEAS CORPUS PETITION; AND**
**(2) GRANTING A CERTIFICATE OF APPEALABILITY**

Petitioner Mario Henderson ("Petitioner") has filed an application for the writ of habeas

corpus under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state convictions on

the grounds that: (1) the State used perjured testimony at his trial; (2) the evidence was

insufficient to sustain the jury's verdict; and (3) the prosecutor's improper remarks deprived him

of a fair trial. The Court has concluded from a review of the record that the state appellate

court's adjudication of these issues was objectively reasonable. Therefore, the Court DENIES

the habeas petition.

**I.**      **BACKGROUND**

      **A.**      **The Trial and Sentence**

The Court recounts the background circumstances of the instant case from the Michigan

Court of Appeal's July 22, 1993 decision:

> After a joint trial with separate juries, defendant [Darryl Jamual] Woods was
> convicted of felony murder and premeditated murder, assault with intent to
> murder, assault with intent to rob being armed, and felony firearm. Defendant
> Henderson was convicted of felony murder, second degree murder, assault with

1

intent to do great bodily harm less than murder, assault with intent to rob being armed, and felony firearm.

At the time of sentencing, Woods' conviction for premeditated murder and Henderson's conviction for second-degree murder were vacated. Woods was sentenced to mandatory life without parole for felony murder; ten to thirty-five years for the assault with intent to commit murder; eight to thirty-five years for the assault with intent to rob; and the mandatory two-year term for felony firearm. Henderson was sentenced to the mandatory life term without parole for felony murder; six to ten years for the assault with intent to do great bodily harm; eighteen to forty years for the assault with intent to rob; and the mandatory two-year term for felony firearm. Defendants appeal. We affirm.

These consolidated cases involve the shooting death of Anthony Capers and the gunshot injuries of Cecil Brewington during an attempted drug-related robbery in the City of Detroit on January 25, 1990. According to the trial testimony, Brewington went to Capers' house to lend him $3500 to purchase four and one-half ounces of cocaine from defendant Woods. Brewington waited with Capers and a third man, Charles Kemp, for Woods to arrive with the cocaine.

When Woods arrived at Capers' house, he was accompanied by defendant Henderson. In response to Capers' inquiries, Woods explained that he did not have the cocaine with him, but that two men waiting outside in the car had it. Capers and Brewington then became nervous, and Brewington suggested that Capers "squash" the deal. At that point, Woods offered to get the cocaine himself from the men in the car.

While defendant Henderson remained in the house, Woods went to the car and returned with the two men. As soon [as] they were inside the house, one of the two men from the car pulled out a gun and announced a "stick-up." At that point, Kemp testified that defendant Henderson told him to "Face down," and saw that Henderson was armed as were the other three.

When Capers, who was unarmed, began moving toward the back bedroom, he was chased and was shot six times by one of two men from the car. After the gunfire from the back of the house was heard, the gunman covering Brewington demanded to know who had the money. Brewington said that he did, throwing the money on the dining room table. As the gunman bent down, Brewington ran to the front door. When Brewington refused to let go of the door, Woods shot him in the leg and again in the thigh. As Woods raised the gun to his head, Brewington grabbed Woods' hand and the gun fired a third time, missing Brewington. When the door would not open, defendants Woods and Henderson fled with the other two men through the front window, leaving the area in a blue car.

2

*People v. Henderson*, No. 136746, slip op. at 1-2 (Mich. Ct. App. July 22, 1993) (per curiam)

(internal citations omitted).

Petitioner and Woods did not testify at trial, nor present any witnesses.

## B.     Direct Appeal

Petitioner raised two issues on direct appeal: (1) the sufficiency of the evidence; and (2)

the prosecutor's conduct.  These issues comprise Petitioner's second and third habeas claims.

The Michigan Court of Appeals first rejected the sufficiency of the evidence argument:

A review of the record shows that Henderson's convictions relied primarily upon the testimony of Charles Kemp, who identified Henderson as Woods' companion from the outset. Kemp also testified that once all four men were inside the house, Henderson and the others pulled out guns after announcing a stick-up and that Henderson ordered him to lie face down at gunpoint. During the course of the attempted robbery, Capers was killed and Brewington was shot several times. As previously noted, all four men left together through the front window of the deceased's house.

The evidence clearly supports the conclusion that Henderson acted in concert with associates, aiding and abetting in the crimes of which he was convicted. The evidence that Henderson pulled out a gun and told Kemp to lie face down after a robbery was announced shows that he knowingly aided and abetted an armed assault with intent to rob and supports his conviction of felony firearm. Further, the evidence that Henderson drew a gun in concert with the three men, two of whom subsequently used them against unarmed men, is sufficient to support the inference that he aided and abetted in the felony murder of Capers and the assault to do great bodily harm less than murder of Brewington. As with defendant Woods, there was evidence supporting a finding of malice for felony murder because a jury could infer from the presence of guns, and their use, that Henderson shared with his associates a wanton and wilful disregard of the likelihood of death or great bodily harm resulting from the use of those guns in the course of the attempted armed robbery.

*Id*. at 5 (internal citations omitted).

Although the court found some merit to Petitioner's argument that the prosecutor made improper remarks during *voir dire* and closing arguments, it concluded that the other evidence in the case was strong enough to sustain the conviction:

> Because defendant Henderson did not timely or specifically object to the prosecutor's improper remarks at trial, appellate review is thus precluded absent a miscarriage of justice.
> . . . .
> In this case, the prosecutor's remarks to the jury purporting to explain the presumption of innocence, particularly her statement that "Jackson Prison is full of people who at one point were presumed to be innocent," were improper. Had defendant Henderson objected, a cautionary instruction of sufficient severity might have cured the defect which was a gross mischaracterization of the presumption of innocence.
>
> In this case, we believe that no miscarriage of justice occurred only because the evidence against defendant Henderson was overwhelmingly strong to support the convictions returned by the jury. Had this been a close case where the evidence was not so clear, we would not have hesitated to reverse. Here it is only the strength of the case that prevents us from ordering a new trial on the ground that the prosecutor's remarks during voir dire resulted in manifest injustice.

*Id*. at 5, 7 (internal citations omitted).

On April 29, 1994, the Michigan Supreme Court denied leave to appeal. *See People v. Henderson*, 445 Mich. 877 (1994).

## C.     State Collateral Review

On April 21, 1997, Petitioner filed a *pro se* motion for relief from judgment. He later filed a supplemental motion through counsel and joined in his co-defendant's motion for relief from judgment. The trial court held an evidentiary hearing to determine whether the key prosecution witness, Charles Kemp, perjured himself at trial and whether newly discovered evidence from Willie Thomas justified a new trial. These issues form the basis for Petitioner's first habeas claim.

The trial court granted Petitioner's motion after concluding that Petitioner was convicted on the basis of perjured testimony.

The prosecutor appealed, and the Michigan Court of Appeals reversed the trial court's decision:

> The court failed to apply the good cause requirement in granting defendants' motions for judgment relief. The defendants did not raise this issue in their prior appeal because Charles Kemp had yet to recant his testimony and they apparently were not aware that Willie Thomas was present just before and after the shooting. Assuming that this is sufficient to meet the good cause requirement, the issue is whether defendants sufficiently demonstrated prejudice to warrant a new trial.

> For a new trial to be granted on the basis of newly discovered evidence, a defendant must demonstrate: (1) the evidence was newly discovered, (2) the newly discovered evidence was not cumulative, (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial, and (4) the new evidence makes a different result probable on retrial. However, when newly discovered evidence is in the form of a recanting witness who testified at the original trial, our courts have traditionally regarded this evidence as suspect and untrustworthy. In reviewing whether the trial court abused its discretion in deciding the motion for a new trial, this Court generally must defer to the trial court's superior opportunity to appraise the credibility of the witnesses.

> The trial court failed to assess the substance of the new testimony and review the evidence from the trial to determine whether the testimony would probably have made a different result probable. A review of the trial testimony shows that the new testimony would not have changed the outcome of the trial, in light of the statements given by each defendant. Woods admitted that he shot Cecil Brewington, which was contrary to the testimony given by Kemp that Woods was not armed with a weapon and did not shoot anyone. Henderson's account directly contradicted Kemp's account that he arrived separately with Woods; instead, Henderson stated that Woods went inside the house first, came back, and then all four of them went inside the house. Although both witnesses also provided impeachment testimony with respect to Brewington, it was only related to a collateral point on Brewington's direct involvement in selling drugs and whether he knew Charles Kemp before the shooting. In addition, the tape-recorded phone conversations between Kemp and others prior to the motion hearing call his credibility into question. Because the new evidence would not affect the outcome of the trial, the court abused its discretion in granting the motions for relief from judgment.

*People v. Woods*, No. 249037, 2004 WL 2601236, *1 (Mich. Ct. App. Nov. 16, 2004) (per

curiam) (unpublished) (internal citations omitted).

The Michigan Supreme Court denied Petitioner's application for leave to appeal on the

ground that Petitioner had failed to establish entitlement to relief under Michigan Court Rule

6.508(D). *See People v. Henderson*, 474 Mich. 955 (2005).

### D.     The Habeas Petition and Responsive Pleading

Petitioner filed the instant habeas corpus petition through counsel on March 14, 2006.

The grounds for relief read:

> I.     Petitioner was denied due process of law when the State used perjured testimony at trial that lead to Petitioner's conviction and a newly discovered witness provided evidence establishing prejudice to Petitioner's right to a fair trial.
>
> II.    Petitioner Henderson was denied due process of law because there was insufficient evidence to sustain the verdict.
>
> III.   Petitioner Henderson was denied a fair trial by the prosecutor's improper remarks during voir dire denigrating the presumption of innocence and improper closing arguments.

Respondent contends that:  (1) the prosecutor did not knowingly present perjured

testimony, and Petitioner is not entitled to relief on the basis of newly discovered evidence; (2)

the state court's conclusion on Petitioner's second claim (insufficient evidence) was a reasonable

application of Supreme Court precedent; and (3) Petitioner's prosecutorial misconduct claim is

procedurally defaulted.[2]

---

[2]     Respondent has not alleged that Petitioner failed to comply with the one-year statute of limitations, and the Court is not required to raise the issue *sua sponte*. *Day v. McDonough*, 547 U.S. 198, 209 (2006).

Petitioner replies that the State refused to correct the error once it learned that Kemp committed perjury at trial, and the Supreme Court has left open the question of whether a free-standing claim of innocence is possible. Petitioner also alleges that his prosecutorial-misconduct claim is not procedurally defaulted and that, even if it is, he can establish "cause" for the alleged error and resulting prejudice or that a miscarriage of justice will occur if the Court does not consider his claim.

## II.     ANALYSIS

### A.     Standard of Review

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits –

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410 (emphases in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.

"Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original). Furthermore, section "2254(d) dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotation marks and citations omitted). In addition, "state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1)." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004).

## B. Issue No. 1: Sufficiency of the Evidence

Petitioner alleges that there was insufficient evidence to sustain his convictions for felony murder, assault with intent to do great bodily harm less than murder, and assault with intent to rob while armed. According to Petitioner, the prosecutor did not prove that he participated in the killing or that he had the necessary intent to be found guilty of the crimes for which he was convicted. The Michigan Court of Appeals reviewed this claim on the merits and determined that the evidence supported the conclusion that Petitioner aided and abetted his associates in committing the crimes.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). After *Winship,* the critical question on review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. [T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted) (emphasis in original).

The *Jackson* "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," and through the framework of 28 U.S.C. § 2254(d). *Id*. at 324 n.16; *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002).[1] "Circumstantial

---

[1]     Michigan law provides the following elements for the offense of felony murder: "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [the statute, including armed robbery]." *People v. Carines*, 460 Mich. 750, 759 (1999) (alteration in original). "[M]alice can be inferred from the use of a dangerous weapon." *People v. Bulls*, 262 Mich. App. 618, 627 (2004).

The elements of assault with intent to do great bodily harm less than murder are: "(1) an attempt or offer with force or violence to do corporal hurt to another (an assault), (2) coupled with an intent to do great bodily harm less than murder." *People v. Harrington*, 194 Mich. App. 424, 428 (1992). The phrase "'intent to do great bodily harm less than the crime of murder' has been defined as an intent to do serious injury of an aggravated nature." *People v. Mitchell*, 149 Mich. App. 36, 39 (1986).

Finally, "[t]he elements of assault with intent to rob while armed are: (1) an assault with force and violence; (2) an intent to rob or steal; and (3) the defendant's being armed. Because this is a specific-intent crime, there must be evidence that the defendant intended

evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v. Allen*, 201 Mich. App. 98, 100 (1993).

It is not disputed that Petitioner was present when Anthony (Tony) Capers and Cecil Brewington were shot on January 25, 1990. The relevant question is Petitioner's intent.

---

to rob or steal." *People v. Cotton*, 191 Mich. App. 377, 391 (1991) (internal citation omitted).

"[O]ne convicted as an aider and abettor is punished the same as the principal of the offense." *People v. Coomer*, 245 Mich. App. 206, 223 (2001) (citing MICH. COMP. LAWS § 767.39). Aiding and abetting encompasses:

> [A]ll forms of assistance rendered to the perpetrator of the crime and comprehends all words or deeds which may support, encourage or incite the commission of a crime. Mere presence, even with knowledge that an offense is about to be committed, is not enough to make one an aider or abettor. To be convicted, the defendant must either himself possess the required intent or participate while knowing that the principal possessed the required intent.

*People v. Vicuna,* 141 Mich. App. 486, 495 (1985) (internal citations omitted), *disapproved of on other grounds by People v. Dalessandro*, 165 Mich. App. 569, 574 (1988).

> To prove felony murder on an aiding and abetting theory, the prosecution must show that the defendant (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony.

> In order to satisfy the malice standard required under *People v. Aaron*, the prosecution must show that the aider and abettor either intended to kill, intended to cause great bodily harm, or wantonly and willfully disregarded the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. Further, if an aider and abettor participates in a crime with knowledge of the principal's intent to kill or to cause great bodily harm, the aider and abettor is acting with "wanton and willful disregard" sufficient to support a finding of malice.

*People v. Riley*, 468 Mich. 135, 140-41 (2003) (internal citations omitted).

The forensic pathologist, Dr. Ljubisaj Dragovic, testified that Capers died from multiple gunshot wounds. The pathologist maintained that the gunshots which penetrated Capers' head and heart were fatal wounds, but any gunshot wound to the body is potentially fatal.

Brewington testified that he went to Capers' home on January 25, 1990, to loan Capers $3,500 for the purchase of cocaine from Woods. Kemp also was present at Capers' home. When someone knocked on the door, Capers went to the door and admitted Woods and Petitioner. Capers asked Woods for the cocaine. Woods responded that he did not have it, but that the two men in the car had it. Woods suggested that Brewington go to the car and get the cocaine, but Brewington refused to leave the house. He told Capers to forget the deal. Woods then offered to go to the car to get the cocaine. Woods left the house, but Petitioner remained inside. Shortly afterward, Woods returned with two other men, and Capers walked to the back of the house.

One of the two men who had been in the car and whom Brewington did not know pulled out a gun and said, "Freeze. This is a stick-up. Who got the money?" Brewington heard gunfire coming from the back of the house where Capers had gone. After he heard the gunshots, he threw the money at the man. As the man bent down to pick up the money, Brewington ran to the front door. He could not get the door open. Woods then approached him and shot him twice in the leg. Woods aimed the gun at his head, but Brewington grabbed Woods' hand. Then one of the unidentified men assisted Woods in bringing Brewington back into the living room. All four of the men (Petitioner, Woods, and the two unknown men) had guns. They left through a window, but Brewington did not see them take the money with them. He ran to the bedroom and saw Capers lying on the bed. He left the house and ran to the home of Capers' brother.

Eventually, he was taken to a hospital where he made a statement to the police. He told the police that he did not know the four men or why they had come to the house. He failed to tell the police about the drug deal because he was afraid of incriminating himself. The next day, however, the police returned, and he agreed to tell the truth about everything that happened.

Kemp testified that he and Brewington were at Tony Capers' home after 6:00 p.m. on January 25, 1990. According to Kemp, Capers was waiting for Woods to arrive. When Petitioner and Woods arrived, Capers admitted them. Woods went back outside to get something, while Petitioner remained inside and talked to Capers. Woods returned to the house with two additional men, one of whom had a package. Someone demanded money. Capers then went to the back bedroom followed by the two unknown men (not the defendants). Kemp heard shouting and three gunshots, which sounded as though they came from the bedroom. All four men had guns. Petitioner told Kemp to lie face down on the floor. Kemp complied because Petitioner had a handgun, which he put in Kemp's face. As Kemp lay on the floor, he heard the men trying to get Brewington to open the door. When Brewington said that he could not open the door, Kemp heard more gunshots, and Brewington screamed. The men subsequently left through a window, which they kicked out. Kemp went to the bedroom where he saw Capers lying on the bed with injuries to his head and chest. Kemp exited the house through the same window that the gunmen used.

Kemp did not get injured during the incident, and he denied being connected to the drug transaction. He admitted that he recently had been convicted of breaking and entering a house, but he denied being offered a deal for his testimony at Petitioner's trial, and he claimed that he did not expect any favorable disposition in his case because of his testimony.

Sergeant Charles Flanagan testified that he spoke with Brewington while Brewington was being treated in the hospital. Brewington informed Flanagan that there were four perpetrators and all four men had handguns. Brewington also told Flanagan that the four perpetrators came to the house to kill Capers and that they chased Capers into the back room when they arrived. Flanagan arrested Petitioner on March 14, 1990.

Sergeant Charles Braxton took a statement from Petitioner on March 15, 1990. Petitioner informed Braxton that, on the day of the shooting, he asked his cousin, Woods, where he could buy some "weed." Woods came to his house about 7:00 p.m. that evening accompanied by two men, whom Petitioner did not know. One of the strangers drove the four of them to a house on Sparling St., where Woods got out of the car and went inside. About two minutes later, Woods came out of the house and motioned for the other men to come inside. They got out of the car and went into the house. Petitioner sat in a chair and watched videos on the televison. Capers went toward the back part of the house out of Petitioner's sight. A few minutes later, three gunshots came from the back of the house. When he heard the gunshots, he tried to get out the front door. Since it would not open, he kicked in a window and exited the house through the window. He went home and told his mother what had happened.

Petitioner denied having a gun or shooting anyone, but he informed Braxton that Woods and the other two men had guns. Petitioner said that he heard three gunshots at first and approximately two more as he was going out the window. He thought that the driver of the car must have shot Capers because the driver was the only person not in his sight at the time. He denied seeing an exchange of money for drugs or an attempt to exchange money for drugs, although he admitted that he thought the conversation in the dining room was about drugs.

A rational trier of fact could have concluded from the facts as summarized above that Petitioner aided and abetted his co-defendant and the two unidentified men in the crimes. Petitioner's intent to rob the victims can be inferred from the fact that a robbery was announced shortly after the unidentified men entered the house. Petitioner assisted his accomplices by pointing a gun at Charles Kemp and by directing Kemp to get down. He did not leave or excuse himself when one of the men said, "This is a stick-up."

Petitioner's intent to kill, to do great bodily harm less than murder, or to create a high risk of death or great bodily harm can be inferred from his possession of a firearm. He acted in obvious disregard of the life-endangering consequences of his conduct. Although the testimony indicated that Woods shot Brewington and an unidentified man shot Capers, Petitioner set in motion a force likely to cause death or great bodily harm by engaging in an armed robbery with his accomplices. *Carines,* 460 Mich at 759. The jury could have inferred that he acted with malice because he participated in a robbery using a dangerous weapon and thereby acted in wanton and wilful disregard of the possibility that death or great bodily harm would result. *Id.*

"[I]t [is] not irrational for the jury to accept the prosecutor's evidence as establishing guilt beyond a reasonable doubt." *Tinsley v. Million,* 399 F.3d 796, 815 (6th Cir. 2005). Therefore, the state court's rejection of Petitioner's claim did not result in a decision that was contrary to, or an unreasonable application of, *Jackson*.

### C. Issue No. 2: Perjury and New Evidence

Petitioner alleges that the State used perjured testimony to convict him and that a witness, whom he discovered years after his trial, has demonstrated that he was deprived of a fair trial. The basis for these claims is testimony offered at a post-conviction hearing in state court. Kemp

recanted his trial testimony at the hearing and stated that he lied at trial. He claimed that neither Petitioner nor Woods had a gun during the incident on January 25, 1990, and that neither one had anything to do with Capers' death or the attempted robbery. Kemp also claimed at the evidentiary hearing that, contrary to his trial testimony, Petitioner did not order him to lie down and that there was no demand for money. Kemp asserted that Brewington directed him to clean up the house after the attempted robbery and that he (Kemp) complied by removing weapons, money, and a scale.

Willie Thomas testified at the hearing as a newly-discovered witness. He also claimed that Brewington ordered him to clean up the crime scene by removing money and a handgun. Thomas further testified that Kemp and Brewington were involved in the drug business, contrary to Kemp's testimony.

"To prevail on a false-testimony claim, [a habeas petitioner] must show (1) that the prosecution presented false testimony, (2) that the prosecution knew was false, and (3) that was material." *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005). The statements in question must be "'indisputably false' rather than merely misleading." *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000). "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989).

Kemp's trial testimony was material evidence, and he testified at the evidentiary hearing that his trial testimony was false. Even if the Court were to assume that Kemp committed perjury at trial, Petitioner has failed to satisfy the second element of the test for perjured testimony: that the prosecution knew Kemp's trial testimony was false. In fact, he concedes that

the prosecutor was not aware of Kemp's perjury during trial. He claims, however, that the State failed to correct the error once it became apparent at the evidentiary hearing that Kemp perjured himself at trial.

Petitioner's trial was held in 1990, and the evidentiary hearing was held in 2002. Although Petitioner prevailed in the trial court, the Michigan Court of Appeals reversed the trial court's decision, and the Michigan Supreme Court denied Petitioner's application for leave to appeal. The prosecution therefore was not required to correct the alleged error and re-try Petitioner. Petitioner's claim has no merit.

Petitioner alleges that newly discovered evidence undermines the prosecution's proofs at trial and entitles him to a new trial. Habeas relief, however, is limited to cases in which the petitioner is in custody in violation of federal law. 28 U.S.C. § 2254(a). Petitioner admits that the prosecutor did not knowingly use perjured testimony. Although Petitioner asserts that he is actually innocent of the crimes for which he was convicted, "a claim of 'actual innocence' is not itself a constitutional claim." *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

Even if Petitioner has stated a cognizable claim, "[t]he threshold for any hypothetical freestanding innocence claim [is] 'extraordinarily high.'" *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera*, 506 U.S. at 417). "[T]he petitioner must demonstrate that 'new reliable evidence' proves that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Ross v. Berghuis*, 417 F.3d 552, 556 (6th Cir. 2005) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Stated without the double negative, the petitioner must demonstrate that any reasonable juror more likely than not would have reasonable doubt in light of the new evidence. *House*, 547 U.S. at 538.

Deference is given to a trial court's assessment of evidence presented to it in the first instance. Yet the *Schlup* inquiry . . . . requires a holistic judgment about "'all the evidence'" and its likely effect on reasonable jurors applying the reasonable-doubt standard. As a general rule, the inquiry does not turn on discrete findings regarding disputed points of fact, and "[i]t is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses."

*Id*. at 539-40 (quoting *Schlup*, 513 U.S. at 328, 329). A habeas court must consider all the evidence, old and new, incriminating and exculpatory, admissible or inadmissible at trial, and make a probabilistic determination about what reasonable, properly instructed jurors would do. *Id*. at 538. "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id*.

Charles Kemp directly implicated Petitioner at trial by testifying that Petitioner had a gun and ordered him to lie face down on the floor. Kemp denied working for Brewington or being connected with the sale of drugs from the house, and he claimed that he did know Brewington and Capers were selling drugs.

At the state court evidentiary hearing over eleven years later, Kemp testified that he and a man whom he knew as "Fat Man" or William had been selling drugs for Brewington at the time of the shooting. He also testified that neither Petitioner nor Woods had a gun on January 25, 1990, that Petitioner did not tell him to lie face down, and that Petitioner and Woods had nothing to do with Capers' death. He alleged that he, Petitioner, and Woods dove to the floor when they heard gunshots coming from the back bedroom and that he (Kemp) pulled out a gun. He also claimed that there was no robbery and that, after the four men left the house, Brewington ordered him and "Fat Man" to pick up the money that Brewington had thrown on the floor.

When asked about his motive for changing his testimony, Kemp testified that he was incarcerated for a murder in Ohio because people had lied about him at his trial in 1992. He also

claimed that his conscience was bothering him because his lies had resulted in Petitioner and Woods being sent to prison. He stated that he was not promised anything in exchange for his testimony and that he was not forced to testify favorably for Petitioner and Woods. He also acknowledged that he was eligible for parole in four years and could be sent to prison for life if found guilty of perjury. He said that he did not tell the truth when he made a statement to the police because, at the time, he was on probation and Brewington was "out on appeal bond." He did not want to implicate himself or Brewington in any illegal activity. He decided to tell the truth in 2001 when someone contacted him to say that she was investigating the case.

Brewington testified at trial that Petitioner entered Capers' home with Woods on January 25, 1990, and that Petitioner remained in the house when Woods went back outside to get the cocaine. According to Brewington, Petitioner and Woods, in addition to the two unidentified men had guns. Neither Petitioner nor Woods left the house when one of the unidentified men announced a robbery.

Brewington did not testify at the evidentiary hearing. Thomas, on the other hand, testified at the evidentiary hearing, but not at trial. He stated that he was working for Brewington as a drug courier in 1990 and was present at Capers' home about 4:00 p.m. on January 25, 1990. Capers and Brewington were waiting for a deal to happen. Thomas left before Capers got shot. He learned of the shooting from Brewington when he went back to the house on Sparling later that day. Brewington directed him and Kemp to go in the house and pick up the money that was on the floor and a gun, which Brewington handed to him. He did not divulge this information to anyone except his sister, who later contacted him about signing an affidavit. He signed the affidavit in July of 1997 and was interrogated by a police officer in

April of 2000. He denied receiving anything in exchange for his testimony at the evidentiary hearing.

The trial court stated at the close of the evidentiary hearing that it believed Kemp's testimony. The court concluded that Petitioner was unjustly convicted on the basis of perjured testimony. The Michigan Court of Appeals reversed the trial court's decision to grant a new trial because, in its view, the trial court failed to review the evidence at trial and to assess the new testimony. The court concluded that the new testimony would not have affected the outcome of the trial.

"[P]articular weight should be given to a trial court's credibility determinations." *Easley v. Cromartie*, 532 U.S. 234, 262 (2001). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. . . . A federal court can disagree with a state court's credibility determination and, when guided by [§ 2254] conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Id*.

The Court believes that the trial court's credibility determination was unreasonable, because the trial court did not analyze all the evidence. The trial court no doubt recognized that Kemp's testimony at the evidentiary hearing, if presented at Petitioner's trial, would have weakened the prosecution's case, because Kemp gave the impression at the hearing that

Petitioner was merely present during the crimes. Kemp's testimony also contradicted Brewington's incriminating testimony that Petitioner and the other three men who came to Capers' house on January 25, 1990, were armed and acted in concert to shoot him and Tony Capers.

However, if the trial court had viewed all the evidence, it would have noted the weaknesses in Kemp's testimony at the evidentiary hearing. For example, Kemp testified at the hearing that neither Petitioner nor Woods possessed a gun during the shooting incident. Petitioner's own statement to the police asserted that Woods possessed a gun.

Kemp's testimony at the hearing differed from Petitioner's statement to the police in one other aspect. Kemp testified that Petitioner and Woods dove to the floor when they heard gunshots. Petitioner, however, informed the police that he kicked out a window and left the house when he heard gunshots.

If Kemp had testified at trial in the same manner that he testified at the evidentiary hearing, the prosecutor could have brought out the fact that Kemp's testimony was contrary to his testimony at the preliminary examination. Kemp attempted to minimize this fact at the evidentiary hearing by stating that his testimony at the preliminary examination was the result of jail inmates telling him that he would go to prison if he did not testify for the prosecution. He also stated that a police officer had threatened to charge him with the murder if he did not testify for the prosecution. He admitted, however, that the prosecutor never threatened him, and there was no basis for charging him with the crimes.

The trial court also failed to acknowledge that recanting witnesses such as Kemp must be "viewed with extreme suspicion." *McCray v. Vasbinder,* 499 F.3d 568, 574 (6th Cir. 2007)

(citing *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001)). Kemp's recanting testimony was suspicious because he did not approach the authorities with the exculpatory information that he claimed to have. He withheld the information until he was approached by someone who was investigating the case, even though he claimed that his conscience bothered him and that he was incarcerated on the basis of false testimony.

Furthermore, the prosecutor made a compelling argument at the evidentiary hearing that Kemp received money for recanting his trial testimony. To support his position, the prosecutor presented the trial court with a transcript of Kemp's taped telephone conversations while he was incarcerated in Ohio. Although the transcript was sketchy and the parties agreed that the conversations were subject to different interpretations, Kemp mentioned on the telephone that he was coming to Detroit. He stated that he had received $200 from "these dudes' cousin" on Cortland Street in Detroit. He claimed that he was supposed to say they did not do anything.

The prosecutor submitted additional evidence demonstrating that Petitioner received money orders, including one for $200, prior to his taped conversations. Although four money orders purported to come from Kemp's mother, there were three different addresses for the purchaser on the money orders. The $200 money order came from someone living on Cortland Street. The prosecutor argued that the purchasers of the money orders had represented themselves as Kemp's mother, who was on Kemp's approved list of visitors.

In a taped telephone conversation that Kemp had with a woman named Shonte, he said that Shonte should tell him everything that he had to do. Shonte responded that it was important for Kemp to put her on his visiting list when he arrived in the county. At another point, Shonte refreshed Kemp's memory as to his trial testimony and what he was supposed to say at the

evidentiary hearing.  She also prompted Kemp on what he should say if he were asked to explain how he got involved in the case.  She suggested that Kemp testify that the lawyers got him involved.

The trial court thought that Thomas had testified at trial.  Thomas did not testify at trial; he testified only at the evidentiary hearing.  Thus, to the extent that the trial court determined that Thomas perjured himself at trial, the trial court was mistaken.

The trial court's reliance on Thomas's testimony to support Kemp's testimony or show that Petitioner and his companions did not take the drug money also was unreasonable.  While it is true, that the prosecutor would not have been able to prove the felony murder charge without the underlying felony of armed robbery, Brewington admitted at trial that he did not see the men take the money with them.  The jury convicted Petitioner anyway.

Furthermore, Thomas did not come forward with any information until 1997.  And when he was interviewed about the crime, he had a vague memory of the event that occurred on January 25, 1990.  He claimed at the evidentiary hearing that his mind was messed up.

Thomas' testimony that he did not notice any injury to Brewington's leg after the shooting was questionable, because Brewington had been shot two times in the leg.  One witness testified at trial that Brewington was grabbing his leg in pain and was moving slowly after the shooting.  He was bleeding heavily, and the blood was dripping onto the floor.

Thomas' testimony that Brewington stayed at Capers' home after the shooting and directed Thomas and Charles Kemp to clean up the house was contrary to Brewington's trial testimony.  Brewington testified at trial that he left the house and reported the incident to Capers' brother.

The Court need not resolve the disputed factual issues. The Court needs only to determine the likely effect of Kemp's recanting testimony and Thomas' new evidence on reasonable jurors. Having reviewed the evidence, the Court concludes that Petitioner has not made a "truly persuasive demonstration of 'actual innocence.'" *Herrera*, 506 U.S. at 417.

Thus, the Court's confidence in the outcome of the case is not undermined, and the state appellate court's conclusion that the new evidence would not have affected the outcome of the trial was reasonable. Petitioner has no right to relief on the basis of his claim of perjury and newly discovered evidence.

### D.      Issue No. 3: Prosecutor's Remarks

The third and final habeas claim alleges that Petitioner was denied a fair trial by the prosecutor's remarks during *voir dire* and during closing arguments. Petitioner asserts that the prosecutor's comments emasculated the presumption of innocence and denigrated the defense.

Respondent contends that this claim is procedurally defaulted because the Michigan Court of Appeals stated that appellate review of the issue was precluded, absent a miscarriage of justice, due to Petitioner's failure to object to the disputed conduct at trial. Procedural default is not a jurisdictional bar to substantive review of a meritless claim. *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005). The Court will excuse the alleged error. The Court will proceed to review Petitioner's claim because it is more efficient to adjudicate the merits of the claim than to analyze whether the claim is procedurally defaulted and whether Petitioner has shown "cause and prejudice" or a miscarriage of justice.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). To prevail on his claim, a habeas

petitioner must demonstrate that the prosecutor's conduct violated a specific constitutional right or infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). It is not enough to show that the prosecutor's conduct or remarks were undesirable or even universally condemned. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). On habeas review, the complained-of conduct must be both improper and flagrant, and "'so egregious as to render the entire trial fundamentally unfair.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)). When determining flagrancy, courts must consider "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994).

Petitioner contends that the prosecutor made improper comments about the presumption of innocence during *voir dire.* The prosecutor attempted to make a distinction between factual innocence and legal innocence by stating that:

> [T]he judge is not . . . telling you . . . factually that the Defendant is innocent.
>
> . . . .
>
> [S]ome people say, the Judge is telling me he's innocent. The Judge is not telling you that. What the Judge is telling us is that for purposes of this trial only, when he's in this courtroom, you presume him legally to be innocent. In other words, all that does, all the presumption of innocence does is make sure that I, as the Prosecutor, come into the Court with my proof.
>
> . . . .
>
> So if you were to vote now, the whole point is if you vote now you would vote not guilty because he's legally presumed to be innocent. But the point is, ladies and gentlemen, you're not going to be asked to vote now. You're going to be

asked to vote after you hear all the evidence.   And you understand that the presumption of innocence is something that disappears if I prove my case.

. . . .

.Jackson Prison is full of people who at one point were presumed to be innocent.

. . . .

So don't get hung up on this presumption of innocence and say, "Oh my God. You know, he's innocent.  The Judge is telling me he's innocent."  The Judge is not doing that.

(Tr. Oct. 2, 1990, at 124-26.)  The Michigan Court of Appeals ruled that these remarks were improper, but that no miscarriage of justice occurred because the evidence against Petitioner was overwhelmingly strong.

The Court agrees that the remarks were improper, because they undermined the presumption of innocence to which Petitioner was entitled.  However, the fact that the remarks were made during *voir dire* reduced the possibility that they affected the jury.  The trial court stated in its preliminary instructions, which followed *voir dire*, that the jurors must follow the law as explained to them by the court and that they must consider all the court's instructions as a connected series.  (*Id*. at 199 and 205.)

At the close of the case, the trial court stated that it was the court's duty to instruct on the law and that the jurors must take the law as given to them by the court.  The trial court correctly instructed the jurors that the presumption of innocence continued throughout the trial and that Petitioner was entitled to a verdict of not guilty unless the jurors were satisfied beyond a reasonable doubt that Petitioner was guilty.  The Court explained that the prosecutor must prove each element of the crimes beyond a reasonable doubt and that, if the prosecutor failed to make that showing, they must find Petitioner not guilty.  The trial court also stated that the lawyers'

statements and arguments were not evidence and that only properly admitted evidence could be considered when deciding on a verdict. (Tr. Oct. 4, 1990, at 596 and 598-99.)

The prosecutor's improper remarks were rectified by trial court's instructions on the presumption of innocence, by the court's admonition to follow its explanations of the law, and by the court's comment that the attorneys' statements were not evidence. Consequently, even though the prosecutor's remarks were deliberately placed before the jury and were not isolated remarks, they could not have misled the jury or prejudiced the defense. Petitioner is not entitled to relief on the basis of the prosecutor's comments during voir dire on the presumption of innocence.

Petitioner alleges that the prosecutor's closing argument also deprived him of a fair trial. The Michigan Court of Appeals stated on review of this claim that no miscarriage of justice occurred, because any prejudicial effect could have been cured by a timely instruction.

The prosecutor made the following remarks about Petitioner's defense that he was merely present during the crime:

> Now, basically, every time you have more than one person involved in the commission of the crime, people are going to say, I was merely present. That's the standard defense. They are going to claim, "I was merely present." I like to call the merely present defense the three monkey defense. The reason? See no evil; hear no evil; speak no evil. Basically, they say, "I was there, but I didn't say anything. I was there, but I didn't hear anything. I was there, but I didn't see anything. That's how you have to evaluate that evidence. And you have to ask yourself, is he basically saying that in this case?

(*Id*. at 516-17.) Petitioner asserts that these remarks denigrated the defense and were improper.

Prosecutors may not "make unfounded and inflammatory attacks on the opposing advocate," *United States v. Young*, 470 U.S. 1, 9 (1985), but they may highlight inconsistencies or inadequacies in the defense, *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005), and they may

26

point out the lack of evidence supporting the defense theory. *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005). They may even "argue that the jury should arrive at a particular conclusion based on the record evidence, including the conclusion that the evidence prove[d] the defendant's guilt." *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999), *abrogated on other grounds by Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000)). The remarks quoted above were a proper argument on the inadequacy of Petitioner's defense theory.

Petitioner informed Sergeant Charles Braxton that his real name was Mario Woods and that he also used the name Mario Henderson. Sergeant Braxton testified at trial that he learned of additional names Petitioner used when he checked Petitioner's record. (Tr. Oct. 3, 1990, at 455-57.)

During closing arguments, the prosecutor made the following remarks about Petitioner's names:

> Cypes [Darryl Woods] smooths the way for the other two people to enter into the house[] because Cypes goes in with him. Mario Henderson or Mario Woods, depending on which name he's using these days, they go in together and they smooth the way for the other two individuals to go in.
>
> Mario Henderson, this gentleman here, Mario Woods or whatever name he's using these days, he orders Charles Kemp face down.
>
> . . . .
>
> Mario Woods or Henderson, whatever name he's using, and his cousin had guns.

(Tr. Oct. 4, 1990, at 510-11, 513.) Petitioner contends that there was no proper purpose for these comments other than to prejudice the jury, to inflame the jurors' passions, and to appeal to the jurors' fears and prejudices.

Although the prosecutor's remarks in the instant case were certainly improper, this Court agrees with the Michigan Court of Appeals that there was overwhelming evidence in the record otherwise to support Petitioner's conviction. None of these remarks were particularly directed at inflaming the passions of the jury, and the trial court instructed the jury at the end of final argument about the presumption of innocence and that attorney's arguments were not to be evaluated as facts.

## III.   CONCLUSION

Since the state court's decisions also were not contrary to, or an unreasonable application of, Supreme Court precedent, the Court **DENIES** the petition for a writ of habeas corpus.

Reasonable jurists, nevertheless, could debate the Court's assessment of Petitioner's claims.  Therefore, a certificate of appealability may issue on all three of Petitioner's claims pursuant to *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**SO ORDERED.**

 s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  April 14, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the plaintiff and  attorneys of record by electronic means or U.S. Mail on April 14, 2008.

s/Denise Goodine
Case Manager

28